IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | | |
|---|---|---|
| DONALD LAWSON, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | CIVIL ACTION FILE |
| | ) | NO. 4:22-cv-00070-JRH-CLR |
| TSAY/FERGUSON-WILLIAMS, LLC, | ) | |
| | ) | |
| | ) | |
| *Defendant.* | ) | |

## **DEFENDANT, TSAY/FERGUSON-WILLIAMS, LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT**

COMES NOW Defendant, Tsay/Ferguson-Williams, LLC ("Defendant" or "Tsay"), and files this Statement of Undisputed Facts in Support of Its Renewed Motion for Summary Judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure ("FRCP") and Local Rule 56, and in support thereof would show the Court as follows:

Statement of Undisputed Material Facts

1. Tsay is a federal contractor at Fort Stewart, Georgia. (ECF 55–1, p. 2; **Exhibit 1**). As such, Tsay is bound by all Fort Stewart and Hunter Army Airfield safety regulations. (**Exhibit 1**, Section C.1.6, p. 173).

2. As a contractor at Fort Stewart, Tsay is bound by protocols and guidance issued by the Federal Government, including the Garrison Commander at Fort Stewart, Georgia. (**Exhibit 2**; **Exhibit 3**).

3. The Fort Stewart/Hunter Army Airfield Risk Management Policy does not allow acceptance of any risk above "moderate." (**Exhibit 3**, at p. 1). Tsay's safety manager also confirmed this in his deposition. (**Exhibit 4**, 38:21–39:10 ("Q. Now on a federal installation, is TSAY even allowed to accept a high-risk situation? A. No, we're not.")).

4. Tsay confirmed that—for purposes of their contract and type of work conducted—the use of narcotics is a high risk because they impair and influence one's ability to drive. (**Exhibit 5**, 104:12–24).

5. Tsay's handbook states that "all TSAY/F-W employees are required to be drug and alcohol free as described in this policy." (**Exhibit 6**, at p. 25). The handbook further provides guidance that "[d]rugs and/or alcohol used while off duty may remain in an employee's system for days or weeks and can adversely affect performance and workplace safety." (*Id*. at p. 25). Lawson was aware this applied to him and signed this policy. (**Exhibit 7**).

6. Tsay's drug and alcohol policy requires that all personnel who are performing work on its premises and work sites, or who drive a motor vehicle on TSAY business, or otherwise are on duty for TSAY Professional Services, be free of illegal drugs and/or alcohol. (**Exhibit 8**, Section I, p. 1). This policy has identical language to the handbook regarding the adverse effect of drugs and/or alcohol in an employee's system. (*Compare* **Exhibit 8**, Section I p. 1 *with* **Exhibit 6**, at p. 25). Lawson was aware of and signed this policy. (**Exhibit 7**).

7. Tsay's Fleet Management Program states that a driver must not operate a vehicle at any time when his/her ability to do so is impaired or influenced by alcohol, illegal drugs, prescribed or over-the-counter medication, illness, fatigue, or injury. Lawson was aware of and signed this policy. (**Exhibit 9**, at p. 11; **Exhibit 10**). Lawson understood this policy "was applicable to all employees who operate a motor vehicle." (**Exhibit 11**, at 74:18–22). Lawson also understood that he could lose his job if he violated any of the foregoing policies. (*Id*. at 76:16–19).

8. On October 21, 2020, Lawson was interviewed by Tsay for a position as a Water/Wastewater Operator. (ECF 55–1, p. 4; **Exhibit 12**).

9. On October 22, 2020, Lawson was offered a job with Tsay as a Water Plant Operator, which he accepted. (**Exhibit 13**).

10. Tsay's Water Plant Operators oversee checking the water wells around the base, managing the pools, and conducting maintenance on related equipment. (**Exhibit 14**, 16:16–17:16).

11. Heavy lifting, driving company vehicles, and transporting hazardous chemicals are essential requirements of the Water Plant Operator job at Tsay. (**Exhibit 15**, pp. 1–2 (Tsay's essential duties include "physical demands" and "perform[ing] other duties as required or assigned."); **Exhibit 16**, 38:3–10 (Lawson was assigned to drive a company truck to transport hazardous chemicals and perform his job); ECF 55–3, p. 8).

12. During onboarding, Lawson completed Tsay's "Conditional Job Offer & Medical Review" paperwork writing he had "0%" permanent disability due to a job injury, did not take any longer term prescribed medications, and did not suffer any injuries that would affect the essential functions of his position with or without reasonable accommodation. (**Exhibit 17**, p. 1).

13. Lawson provided Tsay with a redacted prescription medication list that obscured details about his alleged disability. (**Exhibit 16**, 12:19–13:10) (*Compare* **Exhibit 18** *with* **Exhibit 19**). Lawson redacted the section that describes his pain management history. (**Exhibit 19**). Specifically, the redacted portion affirmatively shows that Lawson had constant lower back pain, and his medications helped him work long hours. (*Id*.; **Exhibit 16**, 13:2–16 (Lawson confirming he redacted the list because he thought Tsay did not need to know that information)). Lawson did not proactively or expressly disclose the redacted information to Tsay. (*,Id*. at 14:14–15:1).

14. Lawson was on a "sick leave abuse list" during his employment with the City of Savannah for missing work to have elective surgery. (*Id*. at 48:22–25 and 49:12–25; **Exhibit 20**,

p. 10). A fact he did not disclose to Tsay. (**Exhibit 16**, 50:1–5).

15. Lawson never expressly asked for accommodation from Tsay for any perceived or real disability prior to his termination. (**Exhibit 21**; **Exhibit 17**; **Exhibit 16**, 21:23–22:10). Lawson never expressly told Tsay that he needed to take the prescription medications to perform his job. (**Exhibit 16**, 12:5–13).

16. Lawson requested and was granted time off once a month to attend his pain management appointments. (ECF 55–3, p. 4).

17. Lawson did not tell anyone at Tsay the reason he was attending pain management aside from improving his quality of life. (*Id*. at 21:7–22:10). His explanation did not include telling Tsay about his "long-term physical impairments" that cause his chronic back pain. (ECF 55–3, p. 6).

18. The "Return to Work" note Lawson provided does not request accommodation, provide information about an alleged disability, or even list a reason for his visit. (**Exhibit 22**).

19. Lawson's alleged back injury prevents his ability to fully engage in almost any activity, and he cannot perform any job without pain medication. ECF 55–3, p. 6. Lawson did not disclose this information to Tsay either verbally or in writing prior to his termination. (**Exhibit 16**, 10:23–11:11).

20. At all times he was employed by Tsay, Lawson took the following opioids for pain management: Xtampza every twelve (12) hours and Norco up to four (4) times a day, as needed. (**Exhibit 18**; **Exhibit 23**, 27:9–28:4 (explaining the difference between Xtampza and Norco)).

21. Lawson was also taking Ambien, a medication taken to promote sleep. (**Exhibit 11**, 70:13–23; **Exhibit 23**, 26:21–22).

22. Lawson was also prescribed Skelaxin, a muscle relaxant, three (3) times a day.

4

(**Exhibit 23**, 28:20–29:2; **Exhibit 19**).

23. Lawson alleges he follows the guidelines of his doctor regarding the usage of his prescription medication and takes the medications as prescribed. (ECF 55–3, p. 6; **Exhibit 11**, 28:12–15). Lawson also alleges that he has never taken any prescribed mediation at work, but rather before and after work. (**Exhibit 16**, 36:15–23).

24. Lawson was cautioned by his doctor about operating a vehicle and taking his prescription medication. (**Exhibit 24**, Interrogatory No. 14). While these Interrogatories are not signed by Plaintiff, they have not been altered since their discovery. Additionally, Dr. Croft confirmed that the drug inserts caution against driving, and it is widely known that patients should avoid operating vehicles while taking such medication. (**Exhibit 25**, 45:3–46:13).

25. Lawson's expert confirmed that the oxycodone he was taking would remain in his system for hours after ingestion due to it being long-acting. (**Exhibit 23**, 24:22–25:8). Xtampza, the prescription Lawson is taking, is oxycodone. (*Id*. at 27:9–10).

26. Lawson was required to work eight (8) hours per day with a thirty (30)-minute lunch and two (2) fifteen (15)-minute breaks for a total of nine (9) hours per workday. (**Exhibit 2**, p. 7–8).

27. During his probationary period, Lawson was assigned to work with Floyd to learn Tsay's procedures. (**Exhibit 14**, 22:7–10). During that time, Floyd observed Lawson taking "a handful of medicine" while driving a Tsay truck at Fort Stewart. (*Id*. at 30:7–23).

28. Floyd reported to Keithley that he would no longer drive with Lawson after witnessing him ingest the pills, deeming it "reckless and unsafe." (*Id*. at 28:8–18; 32:9–13; 34:15–19). Keithley then reported the incident to Tsay's HR Specialist. (**Exhibit 26**, 49:23–50:12). Messrs. Floyd and Keithley's reports were made in compliance with Tsay's Employee Handbook.

5

(**Exhibit 6**, p. 33 ("Employees are expected to immediately report accidents or any other known health or safety hazards")).

29. Lawson was terminated on November 30, 2020, for violating Section 2 of Tsay's Driver Safety Regulations. (ECF 55–3, p. 8; **Exhibit 16,** 25:15–17; **Exhibit 9**, p. 11; **Exhibit 27**). Lawson has admitted to taking multiple types of narcotics on a long-term basis. (**Exhibit 11**, 70:13–16).

30. Oselio made the decision to terminate Lawson based on Clary's recollection of events. (**Exhibit 28**). This recollection provides that Lawson was driving a company vehicle while taking opioids during work hours. (*Id.*). This recollection shows that no one at Tsay knew about a medical condition he alleged to have. (*Id.*). This recollection shows that Lawson only requested to have time off to attend pain management and did not request to switch medicines or obtain an adequate doctor's note. (*Id.*).

31. Kim Clary, Tsay's Human Resource Representative, did not learn about Lawson's back pain or the reason behind his prescription medication until after he was terminated. (**Exhibit 29**, 46:10–15).

32. Kathy Oselio—Tsay's Risk Management and Human Resource Director—had no actual knowledge of Lawson's prescription medication use until after his termination. (**Exhibit 5**, 55:22–56:9).

33. Only **after** receiving his termination letter from Tsay did Lawson ask whether he could switch to non-narcotic medications or obtain a doctor's note confirming that his current medications did not impair or influence his ability to perform his job. (**Exhibit 16**, 26:2–27:22 (Lawson asking what he could do to "keep [his] job," and later requesting accommodation)).

34. Lawson provided a note from his doctor's office **after** he was terminated that did

not describe the effect the drugs had on him or whether it was safe for him to perform his essential job functions. (**Exhibit 30**).

35. Lawson did not ask his doctor's office to change his medication to comply with his own request. (**Exhibit 16**, 29:10–18).

36. Lawson did not provide his doctor's office with his job description or offer letter at any point to obtain a note that deemed him safe to perform his job. (**Exhibit 11**, 24:8–25:6).

37. Lawson's expert testified that, while some employers might find the note sufficient, he does not. (**Exhibit 23**, 45:17–46:23).

38. Tsay's expert found that Lawson's note was not sufficient to clear him to perform his job duties. (**Exhibit 25**, 95:20–97:2).

39. Tsay's expert testified that Lawson was unsafe and should not have been taking the narcotic medication while holding a safety-sensitive position. (*Id*. at 38:13–39:7). Additionally, his reports concluded that Lawson's prescription mediation "would prohibit him from fulfilling the duties of his work in a safe manner." (**Exhibit 33**, pp. 3 and 5)

40. Lawson's expert could not affirmatively deem him "safe." (**Exhibit 23**, 22:4–23:5).

41. Lawson has not applied for any water operator positions since his termination. (**Exhibit 16**, 56:23–57:1). Lawson's lack of application cannot be attributed to scarcity since there are plenty of "Water Operator" positions in the Savannah, Georgia area. (*See* https://www.indeed.com/q-water-treatment-l-savannah,-ga-jobs.html?vjk=0e93a98bd6b58dbc).

42. Lawson did not re-apply to the City of Savannah because of the "politics," which included Lawson's resignation letter detailing the various issues he had with their management style. (**Exhibit 16**, 48:22–49:11; **Exhibit 31**).

43. Tsay's contract with Pegasus at Fort Stewart will end in August 2025. (**Exhibit 32**, 30:6–7).

Respectfully submitted,

**NEEL, HOOPER & BANES, P.C.**

*Attorneys for Defendant*

*/s/ Bryant S. Banes*
Bryant S. Banes
Texas Bar No. 24035950
*Admitted Pro Hac Vice*
1800 West Loop South, Suite 1750
Houston, Texas 77027
(713) 629-1800
bbanes@nhblaw.com

**ELARBEE, THOMPSON, SAPP & WILSON, LLP**
Attorneys for Defendants
Douglas H. Duerr
Georgia Bar No. 231772
800 International Tower
229 Peachtree Street, NW
Atlanta, Georgia 30303
Telephone: (404) 659-6700
Facsimile: (404) 222-9718
duerr@elarbeethompson.com

## CERTIFICATE OF SERVICE

This is to certify that I have, on this day, filed the foregoing **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF ITS RENEWED MOTION FOR SUMMARY JUDGMENT** with the Office of the Clerk of Court via its electronic filing system, which will notify all counsel of record, including: S. Wesley Woolf

Respectfully submitted this 4th day of February 2025.

Bryant S. Banes
Texas Bar No. 24035950